## PORTLAND-OREGON CITY RY. CO. v. PENNEY.*

(158 Pac. 404.)

**Eminent Domain—Exercise of Right—Power of State.**

1. The state has plenary right to prescribe the conditions upon which it will confer upon corporations the privilege of exercising the right of eminent domain.

**Eminent Domain—Damages—Increased Value—Statutes.**

2. Under Section 6839, L. O. L., providing that no appropriation of private property shall be made until compensation therefor is made to the owner, irrespective of any increased value by reason of the proposed improvements, an owner cannot have any increased value which accrued to his land from a proposed improvement added to his damages, and the party condemning the land cannot have such increased value treated as a part of the compensation and deducted from the amount which would compensate if the land were purchased for any other purpose.

[As to evidence of the special value of property taken in the exercise of eminent domain, see note in 124 Am. St. Rep. 536.]

**Eminent Domain—Railroad Right of Way—Measure of Damages.**

3. The measure of damages for the taking of land for a railroad right of way was the actual cash market value of the strip taken and the incidental depreciation in the market value of the part not included in the right of way.

**Eminent Domain—Damages—Evidence—Technical Error.**

4. In a proceeding to condemn a strip of land for railroad right of way, the admission of the owner's testimony that before the rail-

---

*For authorities on the question of special value of property for the purposes for which it was taken, as an element of damages in condemnation proceedings, see notes in 11 L. R. A. (N. S.) 996 and 46 L. R. A. (N. S.) 392.                                    REPORTER.

81 Or.—6

road went through a certain party offered him $2,300, and that he had agreed to sell it for $2,500 cash, was technical error.

**Eminent Domain—Review—Discretion of Court—Damages—Evidence.**

5. In proceeding to condemn a strip of land for railroad purposes, where it appeared that at about the time of the taking there was little or no active market for land in the vicinity, and that there were few sales by which to fix a standard market value, the admission of testimony of persons residing and owning land in the vicinity that lands situate near that taken were valued at from $600 to $800 an acre, and that it was suitable for gardening purposes, in view of the liberal rules as to the admission of evidence tending to show value, was not an abuse of such discretion.

**Eminent Domain—Review—Harmless Error—Admission of Evidence.**

6. In a condemnation proceeding, technical error in permitting the owner to state what was offered him for his land and what he demanded was not reversible error, where such statement was merely his way of putting a value upon his land, and where the effect of his whole testimony was merely that he considered it worth a certain amount cash.

From Clackamas: JAMES U. CAMPBELL, Judge.

In Banc.    Statement by MR. JUSTICE McBRIDE.

This is an appeal from a judgment for damages given in a condemnation proceeding brought by the Portland-Oregon City Railway Company, a corporation, against J. R. Penney and P. E. Penney in Clackamas County.

The plaintiff seeks to condemn for the purposes of a passenger and commercial railway a strip of land 40 feet in width running diagonally through defendants' premises, which consist of a lot in Willamette Park containing about five acres.    The defendants answered alleging that their damage by reason of the proposed taking would be $2,000.    In the reply plaintiff set up the following counterclaims against the incidental damages: (1) That the tract of defendants is valuable chiefly for gardening purposes, and, being distant from the main thoroughfares of travel and difficult of access, has never been cultivated at a profit, and that by reason of the construction of the proposed road it would be made accessible to market, its rental enhanced, and

its market value increased in the sum of $500; (2) that plaintiff intends to construct a depot on the northerly boundary of the tract in question for the convenience of passengers and for taking and delivering freight, and that thereby defendants' land will be increased in value the sum of $500; (3) that the said lands are situated in a ravine and distant from the main highway, and the only ingress and egress thereto at the present time is over a 40-foot unimproved highway; that in reaching said tract of ground from the main highway it is necessary to go down a hill, and in leaving with a load for market it is necessary to pull the load up quite a hill before reaching the main highway; that on account of the construction of said railway through said land another and more convenient highway will pass through said premises, and will be of great benefit and convenience to defendants, and will enable them to ship their freight to market from their own lands without the expense and loss of the heavy pull from said premises to the main thoroughfare, and will enhance the value of said lands in the sum of $500, and that the counterclaims in the amounts stated are presented as a setoff against any or all damages which defendants claim by reason of the construction of said railway; (4) that the land of defendants is composed of two distinct qualities or kinds of soil, the railroad grade heretofore constructed on and across said premises dividing exactly the two different kinds of soil on said tract of land, the land easterly from said grade being a sand and clay loam, suitable for clover, fruit and such products, while the land on the westerly side of said grade is a wet swale soil, valuable and only fit and suitable for cultivation after proper ditches have been dug through the same and led off to lower ground, and that in the construction

of said grade the plaintiff dug ditches on either side of said grade in such a manner as when connected with a main ditch now passing through said low land farther west will aid materially in draining the low land of defendants and add to its fertility and value, and this plaintiff is now willing and proffers to connect the ditches already dug on either side of said right of way with defendants' main ditch situated west of the tract in such manner as may be prescribed by the court, and will remove any surplus waters collecting along either side of said roadway, and will keep said ditches and any connecting ditches so constructed in repair during the life of the railroad. The court excluded evidence tending to sustain each of these counterclaims, and withdrew them from the consideration of the jury, to which ruling plaintiff excepted. There were objections by plaintiff to the admission and rejection of testimony which will be noticed in the opinion.                                                    AFFIRMED.

For appellant there was a brief over the names of *Mr. Harvey E. Cross* and *Mr. Thomas A. Burke,* with an oral argument by *Mr. Cross.*

For respondents there was a brief over the names of *Mr. Leroy Lomax* and *Mr. B. W. Taylor,* with an oral argument by *Mr. Lomax.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1, 2. Section 6839, L. O. L., provides, among other matters:

"No appropriation of private property shall be made until compensation be made therefor to the owner thereof, irrespective of any increased value thereof, by reason of the proposed improvement."

With the justice or injustice of this rule we have nothing to do, as the state has plenary power to prescribe the conditions upon which it will confer upon corporations the privilege of exercising the right of eminent domain.   The language above quoted is plain, and clearly means that in computing the damages to a tract of land by reason of the construction of the road across it the owner cannot be heard to say that any increased value which may accrue to the land by reason of the facilities offered by the proposed improvement shall be added to his damages, nor can the corporation be heard to say that such increased value shall be treated as a part of his compensation and subtracted from the sum which would be compensation if the land were purchased for any other purpose than a railroad.

3. The measure of damages is the actual cash market value of the strip taken and the depreciation in market value of that portion of the tract not actually included in the right of way, which damages are sometimes termed incidental damages; and it is in respect to the measurement of these that courts have experienced the greatest difficulty.   To the ordinary mind, unhampered by precedent and unrestrained by statute, it would appear that, if the owner were paid the full market value of the strip taken, the value of his property being greatly increased by the improvement and by the facilities afforded for marketing the produce grown upon the ground not included in the strip, he would not be entitled to a single cent by way of damages because his land had been cut into two parcels instead of being left intact.   This would appear to be the common-sense view of the matter, even if the lands of his neighbors should be equally enhanced in value; but the statute in this state and statutes and judicial

decisions in other states have said that increase in the value of the property by reason of the construction of the road shall not be considered in estimating damages, and, in effect, require the jury to estimate all the inconveniences caused by the construction of the road and to eliminate the incidental benefits which are shared in common by the other members of the community. This seems to be the law in Oregon, and, while the writer follows it with unwilling feet, the courts are bound to recognize it until it is amended. In this view the court was entirely justified in withdrawing the first three counterclaims from the jury. As intimated in *Portland & O. C. Ry. Co.* v. *Ladd Estate,* 79 Or. 517 (155 Pac. 1192), the benefits pleaded are shared in a greater or less degree by all of the community along the line of the proposed road; the difference being merely one of degree rather than of class. The last offset was not fully pleaded, in that it merely stated that defendants would be "greatly benefited" without stating any amount or sum in which defendant would be so benefited.

4. Exception was taken to the ruling of the court respecting certain testimony introduced by defendants for the purpose of showing the market value of the tract. The bill of exceptions is very meager, and appears to have been made up and signed without service upon the defendants' attorneys and without any notice to them. In many respects it fails to show the relation of the testimony to which objection was made to that which preceded or followed it, and is far from being sufficient to bring before us the exact situation as it existed at the trial. J. R. Penney, being a witness in his own behalf, was asked the following question:

"Mr. Penney, I will ask you if you had any *bona fide* offers to purchase it [referring to the land in question] last year?"

The witness, over the objection of plaintiff, answered:

"Before the railroad went through there Mr. Greene offered me $2,300. That was before the railroad ever came there. I said he could have it for $2,500, and it would have to be a cash proposition at that."

The admission of this testimony was a technical error: Lewis on Eminent Domain (2 ed.), § 446, and cases there cited; 13 Ency. Ev. 451, and cases there cited.

Mr. Samuel Penney, being called as a witness for defendants, gave the following testimony:

"Q. Are you acquainted with the value of the land?

"A. I know what I paid for what I have got.

"Q. Do you know what the Webber tract sold for just south?

"Mr. Cross: The Webster tract?

"A. Yes, sir.

"Mr. Cross: That does not make a competent, qualified witness as to the value.

"Court: Whether he knows the value of the land taken from sales taken place in recent times.

"Q. Do you know the market value of the lands sold in that vicinity from sales that have been made in recent years?

"A. I have paid no attention; I have heard of sales made, but I do not know of any positive sales that have been made.

"Q. You have heard of sales about there? Well, you know from just what you have heard? You were not present, you mean, when the money passed?

"A. I could not say about any tract the sale was made on, what price was paid on it. I could not come out here and say, because I don't know.

"Q. Do you know what the people asked for their land?

"A. I know what I asked for mine.

"Q. Do you know what Mr. Greene asked for his?

"A. I have heard him say.

"Q. He has two five-acre tracts?

"A. Yes, sir; one on the north, and one on the west.

"Q. Do you know what people generally hold their land for?

"A. I have heard them say.

"Mr. Cross: I object to that as being incompetent.

"Q. You know what you ask for it and what you paid for it, and from what you heard after the sales of other land, and what you know of the sales that were made in the last year or two. From all that information what would you say was a reasonable market value of your brother's property?

"Mr. Cross: I object to that. He has not shown himself qualified and the testimony is incompetent.

"Court: I think it is competent to go to the jury for what it is worth. I think the court has held a man who owns land himself in the immediate vicinity can fix what he takes the value of his land. The objection will be overruled, and the exception allowed.

"A. Well, the land on the road adjoining my brother's place there that him and I owned at one time, that I bought for him I consider that is worth somewhere near $600 or $700 an acre."

He was allowed to say in the same connection that his brother's land, which is the land in controversy, was a better piece of ground than his. This excerpt standing by itself is too inadequate for the court to be able to say whether there was substantial error in permitting it to go to the jury. From it we gather that the witness is an adjoining proprietor; that he knows for what another tract of land just south of the land in controversy sold; that he had heard of sales of land being made in the vicinity, but could not say of his own knowledge what price was paid; that he knew by general hearsay at what the neighbors held their land; that he bought his brother's land for him; that his own land adjoining was worth $600 an acre; and that he considered his brother's land a better piece. Mr.

Greene, who owned a tract adjoining the land in controversy, was permitted to testify as to the value of his own land and of other lands in the immediate vicinity, and to state what the asking price of such land was. He testified that he would not take less than $1,000 an acre for his tract, and described his buildings and improvements. It does not appear that there was any objection made to this part of his testimony. Thereafter the following questions were asked:

"Q. What is the character of your five acres on this side of Mr. Penney's five acres adjoining on the west? Is it improved or unimproved?

"A. Most of it is improved ground.

"Q. Is it all cleared?

"A. There is about an acre that is not cleared. I have a peach orchard on it, and I have commenced grubbing the peaches there last year.

"Q. What is the value of the tract on the west side of his [meaning Mr. Penney's]?

"Mr. Cross: I object to that, and ask to have the answer stricken out on the ground that he has not shown himself to be competent. It seems to me the rule does not permit a man to show the value of his tract of ground, but it has already been answered.

"Court: I still think the only way where there are no sales that are known of for the men to fix what they know is the value of their own property.

"Mr. Cross: I note an exception to the ruling of the court.

"Q. What is the reasonable market value of this tract on the west side of Mr. Penney's land? How much is that worth?

"A. I know what I would ask for it.

"Q. Well, knowing the character of the land and all those things and from all the information you have—

"Mr. Cross: I object because he has not shown himself qualified as a witness.

"Court: It is a question of what it is worth on the market.

"A. I would not take less than $500 an acre for it.

"Court: Would you pay that much for it?

"A. I would if I wanted it; yes."

Counsel for plaintiff moved to have the answer last quoted stricken out, which was refused, and an exception allowed. John Wise, a neighboring proprietor, testified that he had lived on his place all his life, and had been engaged in farming; that he had heard of a tract about a mile from defendants' land being sold within the preceding two years, but did not state for what it sold. He testified, over objection, that the reasonable value of his own land was about $800 an acre.

5. Incomplete as the bill of exception is, it is evident that at and about the time of the occupation of this tract by defendants there was little or no active market for lands in its vicinity, and there were few sales by which to fix a standard of market value. Under such circumstances the courts adopt a very liberal rule as to the admission of evidence tending to show value, and very much is left to the discretion of the court. It would seem that under such circumstances persons residing and owning land in the vicinity ought to be presumed to have some knowledge of the value of their own and their neighbors' land without being required technically to qualify as experts.

"It is presumed that a person who has owned and resided upon land for several years is sufficiently familiar with it and with the value of lands in the vicinity to be qualified to testify thereto": 13 Ency. Ev. 489; *Robertson* v. *Knapp,* 35 N. Y. 91; *Pinkham* v. *Chelmsford,* 109 Mass. 225; *Hayden* v. *Albee,* 20 Minn. 159 (Gil. 143); *Chicago & Rock Island etc. Ry.* v. *Buel,* 56 Neb. 205 (76 N. W. 571); *Union Pac. R. Co.*

v. *Lucas,* 136 Fed. 374 (69 C. C. A. 218); *Mains* v. *Haight,* 14 Barb. (N. Y.) 76.

The fact that the land in question was situated in the near vicinity of other lands of the value from $600 to $800 an acre, coupled with the additional fact stated in the reply that it was suitable for gardening purposes, furnished at least two of the elements by which the jury might arrive at some approximation as to its value. Such testimony is quite as valuable as that of so-called experts who are brought from a distance, make an examination of the soil and general capabilities, and testify from the data thus obtained. The witnesses seem to have been careful, cautious farmers, not inclined to overestimate their own knowledge, and it is evident that under the circumstances their testimony was the best that could be obtained, and the court did not abuse its discretion in admitting it.

6. That the court committed a technical error in permitting J. R. Penney to state what was offered him for his land and what he demanded, it is true, but it is not probable that this statement substantially injured plaintiff's case. It was merely the witness' crude way of putting a value upon his land. The effect of his whole testimony was merely that he considered his own land worth $2,500 cash. There is hardly a case tried into which some slight technical error will not creep; and, if appellate courts search microscopically for errors, few cases would go unreversed.

In our opinion this record does not disclose any such substantial error as would justify a reversal, and the judgment is therefore affirmed.        AFFIRMED.

MR. JUSTICE BURNETT and MR. JUSTICE EAKIN absent.