Argued October 7, 1953, modified and remanded January 13, 1954

# STATE OF OREGON, by STATE HIGHWAY COMMISSION *v.* BURK ET AL.

265 P. 2d 783

213

*George A. Rhoten,* of Salem, argued the cause for appellants. With him on the brief were Rhoten, Rhoten & Speerstra, of Salem.

*Ralph Wyckoff,* Assistant Attorney General for Oregon, of Salem, argued the cause for the State Highway Commission, plaintiff-respondent. With him on the brief were George Neuner, former Attorney General for Oregon, C. W. Enfield, Assistant Attorney General and Chief Counsel for the Oregon State Highway Commission, Fred A. Miller, Assistant Attorney General for Oregon, and Robert L. May, Jr., Assistant Counsel for Oregon, all of Salem.

BRAND, J.

This is a condemnation action brought by the State of Oregon by its Highway Commission against the owners and their lessees of land required for a non-access highway. The principal issues in the case are two. The first concerns the claim of the defendants that there should have been separate awards of damages to the owners of the land, on the one hand, and to the several lessees of portions of the same, on the

other. The second main issue is new to our jurisprudence. The question presented is whether the defendants were entitled to compensation for the taking of an alleged right or easement of access. The defendants claim that the court erred in ruling that they were not entitled to damages on account thereof. These and other minor issues were resolved against the contentions of the defendants. The case went to the jury, which returned a single verdict for $33,000 with interest, and a judgment was entered on the verdict condemning the property for a non-access highway. The defendants appeal.

The complaint, which was filed on 8 September 1950, alleges that a certain highway known as the Salem-Dallas Highway, being State Highway No. 30 and State Route No. 22, is a state highway and a part of the state and federal highway systems. The complaint alleges that the section of said highway in question had been previously constructed and maintained, but that traffic conditions had made it necessary to relocate it upon a new line. The complaint alleges that the defendants Burk, Pearl C. Couey and Modella May Rodgers, are the owners of the record title to certain real property which is described therein. We shall refer to this group of defendants as the "owners". It is alleged that the defendants Patzer, Galloway and Winkenwerder claim some title or interest in the property, the exact nature of which is unknown to the plaintiff. The complaint, as modified by the supplemental complaint, describes the tract of land which is required for right-of-way purposes and for proper relocation, construction, improvement, repair, maintenance and operation of said highway by the state. No part of the land condemned for the

new highway was within the boundaries of the old. The property described is a part of a larger tract owned by the defendants and amounts to approximately 8½ acres in area. The complaint then alleges that the highway carries a large volume of traffic and that it is the judgment and opinion of the Commission that, in addition to the acquisition of fee simple title to the real property described in the supplemental complaint, "there be also condemned and extinguished such interest, if any there be, by which a right of access, ingress, egress, or regress, or any right in the nature of a right of access, ingress, egress, or regress, may accrue" to the property owned by the defendants but not taken. The prayer is for an assessment to be made by a jury as to the compensation to which the defendants should be entitled for the taking of the fee simple title to the real property described, and for the extinguishing of all rights of access and reservations or interests "if any there be". The answer of the owners, so far as material to this controversy, alleges that, should their property and rights be taken, there would be damage in the sum of $75,000, the alleged value of the said property and rights, plus the damage to the remaining property of the defendants not taken. It was alleged that the sum stated "is, of course, exclusive of sums, if any, to which defendants Patzer, Galloway and Winkenwerder may be entitled." The last-quoted portion of the answer of the owners was stricken upon motion of the plaintiff. Answers were filed by the defendants Patzer and Winkenwerder. The answer of Winkenwerder alleged in part:

"I.

"On or about November 15, 1949, by a written lease, this defendant duly leased from the owners thereof, from said date until November 14, 1952,

inclusive, a store space known as 'Winks Place' at 556 Edgewater Street, Salem (formerly West Salem), Polk County, Oregon, being approximately 30 feet wide and 50 feet deep, and being part of the Burk Building on the real property described in Paragraph IV of the Complaint. Said lease is in good standing, and ever since the date thereof this defendant has been, and is now, in possession of said leased property and is the owner and operator of a going tavern business thereon, including improvements and trade fixtures constructed and installed on said property by this defendant in reliance upon the full term of said lease.

"II.

"By reason of the aforesaid matters, this defendant's rights and property interests which are sought to be taken by condemnation herein, and his damages resulting from such condemnation, are and will be separate and distinct from the rights, property interests and damages of the other defendants involved herein."

He alleged that the value of his rights and property interests was $15,000, and he sought in addition $750 as a reasonable attorney fee. The allegations of the defendant Winkenwerder concerning the separate value of his leasehold interests were stricken by the court upon the motion of the plaintiff. A similar answer was filed by the defendant Patzer, setting up his unexpired 10-year lease, and alleging that pursuant thereto he had constructed a pumice block and concrete one-story building on said property and had increased the value of the premises thereby. He also claimed that his damages in the amount of $15,000 should be separately assessed, and he sought attorney fees in the sum of $750. The allegations concerning his alleged right to separate assessment of damages were stricken.

After the filing on 3 January 1952 of the supplemental complaint, to which reference has been made, the defendant owners filed an answer. In it they eliminated the allegations concerning their alleged right to a separate assessment of their damages, and in lieu thereof alleged that the true value of the property and rights of all defendants, plus damage to the remaining property, was $85,000 with 6 per cent interest from September 8, 1950. They also sought attorney fees. The plaintiff replied, denying the alleged damages and denying that any sum should be allowed as attorney fees.

On 16 January 1952 the defendant Patzer filed an amended answer. The allegations were similar to those of his original answer except that he eliminated the allegations concerning his separate damage which had been stricken by the court. On 16 January 1952 the defendant Winkenwerder filed his amended answer, eliminating the matter which had been stricken by the court, but amplifying his previous allegations concerning the nature of his leasehold. He alleged that:

"I.

"On or about November 15, 1948, by a written lease, this defendant duly leased from the owners thereof, from said date until November 14, 1952, inclusive, the real property known as 'Wink's Place' at 556 Edgewater Street in Salem (formerly West Salem), Polk County, Oregon, consisting of a store space and adjacent parking lot (on the east side of said building) abutting said Edgewater Street (present Salem-Dallas Highway), and consisting of a parking strip between said building and said street, and consisting of the right of access by vehicles to both the front and rear of said property from along the entire frontage of said building and parking lot from said street.

"II.

"Said store space is approximately 30 feet wide fronting Edgewater Street and 50 feet deep, and is part of the Burk Building on the property described in paragraph IV of the Complaint; but said building is not included in the property described in the Supplemental Complaint. Said parking lot is on the easterly side of said store space and is approximately 35 feet wide fronting on Edgewater Street and approximately 90 feet deep. This defendant's property abuts at the rear thereof on the re-located Salem-Dallas Highway; and the rear 25 feet of said parking lot plus a corner portion of the remainder thereof plus a triangular portion of the front of such parking lot 35 feet long and 10 feet wide on the easterly end of such wedge are included in the property described in the Supplemental Complaint."

Defendant also alleged that the lease was in good standing and that the total value of all the property and rights of the defendants, plus damage to the remaining property and rights was the sum of $85,000. He also sought attorney fees. Replies were filed. The cause was dismissed against the defendants Galloway and judgment was entered upon the verdict of the jury which assessed the damages in a single lump sum, without any segregation as between the various defendants. The judgment recited that "on September 8, 1950, plaintiff, pursuant to the provisions of Section 100-116, O.C.L.A., took possession of, and proceeded to construct a public highway thereon, all of the real property sought to be condemned * * *." The court further found that the defendants were entitled to their costs and disbursements and a reasonable attorney fee to be fixed by the court. The judgment further recited that the plaintiff had elected to take the property and had tendered the amount

of the verdict plus 6 per cent interest from September 8, 1950, and it was adjudged that the real property and all rights of egress and ingress were condemned and appropriated to the State of Oregon.

On 3 April 1952 the defendant owners filed a motion for a supplemental hearing for the purpose of determining the respective rights of all the parties defendant in the lump-sum award. The defendant Patzer joined in the motion, which was denied by the court. The defendant owners filed a statement of costs and disbursements wherein they represented that $3,500 was the reasonable value of the services rendered by the attorneys for said defendant owners. The defendants Winkenwerder and Patzer also sought separate allowance of attorney fees. All claims for separate allowance of costs and attorney fees were denied by the court, and an order was made allowing to all of the defendants jointly, certain costs and disbursements and a single lump sum of $4,500 as attorney fees. The defendant owners filed notice of appeal from the judgment "and the whole thereof". A separate notice of appeal was filed by the defendant owners from the following orders:

"(1) That certain order made and entered May 1, 1952, wherein and whereby the court overruled the motion of defendants Burk, Couey and Rodgers for an order setting a time for the hearing on supplemental proceedings herein for a division of the jury award.

"(2) Portions of the order made and entered regarding costs and disbursements, which order was entered June 17, 1952, which portions are listed as follows:

"(a) That portion which constitutes the refusal of the court to allow the defendants Burk,

Couey and Rodgers separate costs and separate attorneys' fees; and

"(b) That portion denying to the defendants Burk, Couey and Rodgers the right to claim against the plaintiff attorneys' fees in the following matters: (1) supplementary proceedings in this action looking to the division of the award by the jury; (2) separate suit or action for the purpose of effecting such division; and (3) any appellate proceedings."

■ The two appeals of the defendant owners have been consolidated. The defendant Patzer filed notice of appeal from the judgment of condemnation but not from the supplemental orders. He has filed no bond, and presented no bill of exceptions or brief. His appeal must be deemed abandoned. Defendant Winkenwerder has not appealed.

We have summarized the pleadings of the nonappealing defendants because it appears necessary for an understanding of the appeal of the owners.

## EASEMENTS

The defendants assign as error the giving of the following instructions, to which exception was duly taken:

"Now, I instruct you that prior to and at the time the original complaint was filed in this case, the defendant property owners did not own any right or easement of access of any nature whatsoever to and from their real property described in Paragraph III of said complaint and the relocated portion of the Salem-Dallas Highway, and this instruction relates only to the relocated portion of the highway. Therefore, in determining the fair cash market value of all of the defendant property owners' property so described in said Para-

graph III of the original complaint, you will not consider that they owned or that such real property had appurtenant to it a right or easement of access to and from the relocated portion of the Salem-Dallas Highway involved in this case. Likewise, in determining the fair cash market value of the remainder of the defendant property owners' said property, after the appropriation of the 8 and 5/10ths acres on September 8, 1950, you will consider not that said remaining property had any right or easement of access whatsoever taken from either it or the defendant property owners, for the reason that there was no such right or easement of access owned by the defendant property owners or appurtenant to their said described property at the time the complaint was filed in this court. That is, the defendants did not have, nor did their property have appurtenant to it, any right or easement of access to that part of the Salem-Dallas Highway as relocated and involved in this case, and the State has not taken and is not taking any right or easement of access away from them. You will not, therefore, consider there was any such access, nor will you allow any damages to be assessed against the State for any such access."

The instruction given was in accord with the theory of the state. It contended, in substance, that there was no highway in existence across any portion of the defendants' property until the bringing of the instant suit. The state therefore argues that, although, as an abstract statement of law, it is true that owners are entitled to damages for the taking of easements of access, that rule is not applicable to the case at bar "because it assumes that the defendants have an existing right of access." The state argues that since there was no highway in existence there could have been no right in the nature of an easement of access.

The Constitution of Oregon provides that

> "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; * * *." Constitution of Oregon, Art I, § 18.

The statute under which the plaintiff is proceeding provides, in part, that the State Highway Commission may, under certain conditions, which are specified, commence an action in the circuit court

> "for the condemnation of such interests as such owner or owners may have in said real property, including any and all right of access if the real property to be acquired is for right of way purposes, and for determining the compensation to be paid therefor, and the damages, if any there be, for the taking thereof." OCLA, § 100-116, as amended by Laws, 1947, ch 283, p 391.

From the generality of the language employed in the statute, it appears that the state is authorized, in a single action, to do what it has attempted in the pending case, namely, to condemn a non-access highway and thereby to acquire the fee of privately-owned property, to the exclusion of any right of entry appurtenant to the land not taken. The provisions whereby action may be brought for determining the compensation to be paid for a right of access, and the damages, if any there be, for the taking thereof, indicate by implication, the view of the legislative body that the right of access may be a right for which compensation is to be paid, and that the damages, if any there be from the taking, are to be assessed and paid. However, the statute does not apply exclusively to cases in which the state seeks to acquire new land in fee for a non-

access highway. The act is equally applicable to cases in which the state seeks to convert a conventional highway into a non-access highway by condemning only an easement of access. When a conventional highway is established, there is attached to the abutting land an easement of access in, and to, the highway. Such easement is a property right which cannot be extinguished without compensation. This is clear, and it is conceded by the state. Even where the fee of a conventional highway is in the state, it is subject to an easement of access appurtenant to the abutting land. *Willamette Iron Works v. O. R. & N. Co.*, 26 Or 224, 37 P 1016; *Sandstrom v. Oregon-Washington Ry. & Nav. Co.*, 75 Or 159, 146 P 803; *Tooze v. Willamette Valley Southern Ry. Co.*, 77 Or 157, 150 P 252; *Bostwick v. Hosier*, 97 Or 125, 190 P 299; *Ail et ux. v. City of Portland*, 136 Or 634, 299 P 306; *Morris v. City of Salem et al.*, 179 Or 666, 673, 174 P2d 192. The rule is definitely settled in the recent case of *Sweet v. Irrigation Canal Co.*, 198 Or 166, 254 P2d 700, 256 P2d 252. See also *Bohm v. Metropolitan El. Ry. Co.*, 129 NY 576, 29 NE 802; *People v. Al G. Smith Co., Limited*, 86 Cal App2d 308, 194 P2d 750; *Rose v. State*, 19 Cal2d 713, 123 P2d 505; *Anzalone v. Metropolitan District Commission*, 257 Mass 32, 153 NE 325; *Petition of Burnquist*, 220 Minn 48, 19 NW2d 394. But the fact that the establishment of a conventional highway creates in the abutting land the attributes of a dominant, and in the highway the attributes of a servient tenement, does not require the conclusion that such attributes are created when land for a new non-access highway is condemned. This action was brought to extinguish and compensate for all rights of the defendants in the property taken. It extinguishes the right of the defendant to enter, from

his abutting land, the land which once belonged to him, but which now belongs to the state. The same right would be lost to the owner if he had sold the tract to a private individual instead of losing it by condemnation to the state. He would have no right to enter the land sold from the land retained. But this does not mean that he would have had, and then lost, an easement appurtenant to a part of his land for access to another part. It means merely that the statute authorizes the acquisition by condemnation of a fee which is essentially unlike the taking for a conventional highway, and is essentially like the fee which a private individual would acquire by purchase, which of course, would imply no right of access over the vendees' land by the vendor. To be sure, the analogy is not perfect. The state, in acquiring a non-access highway, is taking only for public use, but by authority of the statute, it is taking rights similar in extent to those acquired by private purchasers, and it is devoting such enlarged rights to public use.

■ Since the statute may be employed, either to extinguish conceded and existing easements in a conventional highway, or to take new land for a non-access highway, the statutory provision authorizing compensation for rights of access carries with it no implication that an easement of access, which never existed before, is created by filing an action to condemn a non-access highway, and then, eo instanti, extinguished by the bringing of the same action. The constitution requires compensation for the taking of an easement only if there is an easement to take. If there was none, then the statute which authorizes compensation for such easements does not apply. Whether there is any such property right in the nature of an

easement, when new land is condemned for a non-access highway, is the question for determination.

 Reduced to its simplest terms, our problem is to determine at what point we should hold that the police power ends and the power of eminent domain begins. 11 McQuillin 263, Municipal Corporations (3d ed, Smith, 1950); *Philadelphia v. Scott,* 81 Pa 80, 22 Am Rep 738; 3 Stanford Law Rev 298, 302. Private rights relative to highways may be regulated in many ways under the police power, and that without compensation. If the action of the state amounts to a "taking", then the principles based upon the constitution control and the state must proceed by condemnation. Unfortunately, the statement of the formula does not answer the questions involved. In general, the regulation of highway traffic is within the police power. This includes the establishment of one-way streets, the establishment of traffic lanes, regulations as to speeding and parking, regulations of abutting owners, along with the general traveling public involving circuity of travel, as where one living on a southbound divided street desires to go north, regulations limiting permissible "U" turns, and changes in the highway system resulting in the reduction or increase of the volume of traffic on the highway fronting the property of an owner. See Clarke, The Limited Access Highway, 27 Wash Law Rev 111; Cunnyngham, The Limited Access Highway, 13 Mo Law Rev 29; *State ex rel. Suksdorf v. Superior Court in and for Klickitat County,* 169 Wash 195, 13 P2d 460; 25 Am Jur, Highways, § 253; 40 CJS, Highways, § 232; *Jones Beach Blvd. Estate v. Moses,* 268 NY 362, 197 NE 313; *City of Chicago v. Spoor,* 190 Ill 340, 60 NE 540; *Rose v. California,* 19 Cal2d 713, 123 P2d 505; *City of Stockton v. Marengo,* 137 Cal App 760.

■ One of the traditional and prime functions of the conventional street and highway is, and will remain, that of a "land-service road" providing rights of ingress and egress to and from the property of abutting owners for the benefit of such owners, their invitees and the public. We have seen that where such rights have once become vested, it is almost universally held that they can be divested only by condemnation of the easement appurtenant to the abutting property. In direct contrast with the land-service function of the conventional highway is the purpose and function of the non-access freeway or throughway. The congestion of population in the cities, the amazing increase of rapid automobile transportation, the delays and perils incident to the use of the conventional two-way unrestricted-access highways have rendered imperative the establishment of non-access or limited-access highways or freeways in the interest of the public convenience and necessity. 3 Stanford Law Rev 298; 27 Wash Bar Journal 111.

It is reliably reported that travel upon our inadequate highways results in 40 thousand deaths, a million-and-a-half injuries, and property damage of 2 billion dollars a year, and that these staggering losses have been materially reduced wherever modern non-access highways have been established.

In *Schnider v. State,* 38 Cal2d 439, 241 P2d 1, the plaintiffs brought an inverse condemnation proceeding against the state, seeking compensation on account of the alleged deprivation of a right of direct access. They owned lots which were separated from a conventional highway by an intervening strip of land which was owned by others. Thereafter, the highway

commission authorized the reconstruction of the highway as a limited-access freeway. The intervening strip of land was acquired by the state, thereby widening the highway so that it thereafter abutted upon the plaintiffs' land. The facts created a clear test as to whether land abutting on a non-access highway, but which had never abutted on the conventional highway, acquired any property right of direct access. The trial court held that the plaintiffs were not entitled to compensation for the taking of such alleged right of access. The case went to the Court of Appeals and thence to the Supreme Court. The latter court, by Gibson, C. J. said:

"It is clear from the record that there was no right of direct access to Olympic Boulevard from lots 127 and 130 when the resolution of the California Highway Commission was adopted. It is also clear that such a right did not arise upon the acquisition of the intervening property by the state for highway purposes. Accordingly, we are not concerned with a situation in which the owner of property abutting upon a conventional highway is deprived of direct access when it is rebuilt as a freeway. Nor does this case involve the question of what rights of access plaintiffs would have acquired if the boulevard had been widened and rebuilt as a conventional highway. The sole issue before us is whether plaintiffs acquired a right of direct access as a result of the construction of the freeway.

"* * * The provision of section 100.3 that a declaration creating a freeway 'shall not affect private property rights of access, and any such rights taken or damaged within the meaning of Article I, section 14, of the State Constitution * * * shall be acquired in a manner provided by law', plainly refers to rights of access which exist prior to the establishment of the freeway and not to claimed rights which have had no previous existence and

which could come into being, if at all, only by virtue of the new construction.

"Where a property owner has no right of direct access to a highway before it is converted into a freeway abutting upon his property, nothing is taken from him by the failure to give him such a right when the conversion takes place. &ast; &ast; &ast;

"&ast; &ast; &ast; The construction of the freeway, pursuant to the resolution, did not create new rights of access in favor of land which did not abut upon the highway as it formerly existed. Where an ordinary or conventional road is built there may be an intent to serve abutting owners, but when a freeway is established the intent is just the opposite, and a resolution creating a freeway gives adequate notice that no new rights of access will arise unless they are specifically granted."

As said in *City of Los Angeles v. Geiger,* 94 Cal App2d 180, 210 P2d 717, 724, "There can be no detriment to a right which never existed and no compensation for a loss not sustained. &ast; &ast; &ast;"

In *People v. Thomas,* 108 Cal App 832, 239 P2d 914, proceedings were instituted for the acquisition of a limited-access freeway where no highway had previously existed. On appeal the defendants claimed that error was committed in excluding any damage for severance of access rights. The court said:

"The evidence shows that no highway existed in the location of Parcel 4 prior to the construction of the freeway and it is apparent that appellants never had an existing easement of access to state highway road VIII-Riv-77-E, or any other highway and since no property right was acquired, they have no supportable claim for damages. A 'freeway' is defined as a highway in respect of which the owners of abutting lands have no right or

easement of access to or from their abutting lands or in respect to which such owners have only limited or restricted right or easement of access. Sec. 23.5, Streets and Highway Code. The resolution passed by the highway commission did not create in appellants' property a new right of access to a freeway to be constructed where no highway, conventional or otherwise, existed before. * * * ''

In this connection we quote from an article in the Stanford Law Review which merits consideration by reason of the excellence of its reasoning:

"Suppose the state buys up a completely new right-of-way for a freeway. Take the clearest case first. *A's* land abuts against *B's* land. Assume the public buys up a right-of-way for a freeway from *B,* extending along the boundary of his property with *A,* but leaving a one-foot wide strip of land along the boundary line. Obviously, there is no change in *A's* legal position. Now, suppose the state took *B's* land right up to the boundary with *A.* Why should *A's* rights suddenly change? The freeway was never intended, from its inception, to provide land service to *A.* Rather it was intended to be a traffic service road. The result must be that, since *A* never had a right of access across his property line before, and since no such right was even impliedly given to him by the state, he does not now have a right or access across his property line to the freeway.

"What of *B's* rights? Suppose a part of his land along his boundary line with *A* has been taken. *B,* of course, will be paid for the land actually taken. But should he also be paid for a right of access to the freeway? Again, a simple consideration of our rationale brings out the answer. The land service road concept is inapplicable. *B* was given no access to the public road. He therefore acquired no right of access to be taken.'' 3 Stanford Law Rev, Freeways, p 307.

We conclude that there is no "taking" of an easement of access when a new non-access highway is established by condemnation. An easement implies the existence of a dominant and servient tenement. To assume the existence of an easement appurtenant to land there must be presupposed two tracts of land in separate ownerships. *Petition of Burnquist,* supra, 220 Minn 48, 19 NW2d 394; Restatement, Property, Servitudes, §§ 450, 453, 455, 456, 497. Our conclusion that there was no easement of access and that none was condemned is not decisive of the further question as to whether the non-access character of the highway was relevant on the issue of consequential or severance damages to the remaining property. The effect which the unique and total character of the condemnation may have upon the market value of the property not taken, presents an issue which is not dependent upon the existence of an easement. We again quote from the article in Stanford Law Review, cited supra:

> "As a final case, consider the situation where the right-of-way purchased runs right through *B's* land. In the case of a normal, unrestricted-access highway, *B* will be paid for the land actually taken and also 'severance' damage for the separation of the property. If the highway is to be of limited-access design, with *B* having no right of access, the severance of the two parcels will be more complete. *B* should be, and is, paid for this more complete severance, but this is on the basis of severance damage alone and not on any theory of right of access being denied." 3 Stanford Law Rev, Freeways, p 308.

In this case, the so-called non-access road deprives the defendants of all direct access thereto, although they will still have the possibility of access to the new highway by a long and circuitous route. Land

of the defendants which was taken by condemnation extended southerly to the navigable water of the Willamette River. By reason of the non-direct access character of the land taken, the remaining land which lay to the north of the new highway was deprived of its former direct access to the river. In any event, whether the market value of the land not taken was affected by the "more complete severance" resulting from the character of the highway appropriated, was a question to be determined by the jury upon the evidence. This action is brought pursuant to the provisions of OCLA, § 100-116 as amended by Oregon Laws 1947, chapter 283. Both parties rely upon its provisions, and no reference, either in brief or argument, has been made to Oregon Laws 1947, chapter 226, p 286, relating to the powers of the State Highway Commission. In our opinion, section 16 of the last-mentioned act fortifies our conclusion that the jury was entitled to consider specifically the non-access character of the highway being established when determining the severance or consequential damages to the land not taken. Section 16 reads as follows:

"In any proceeding in eminent domain evidence of the entire plan of improvement shall be admissible for the purpose of determining the following: (1) Value of property taken; (2) all damages by reason of deprivation of right of access to any highway to be constructed, established or maintained as a throughway; and (3) the damages, which, if the property sought to be condemned constitutes a part of a larger parcel, will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and by reason of the construction of the improvement in the manner proposed." Oregon Laws 1947, Ch 226, § 16.

The language employed recognizes the two types of compensation established by our decisions interpreting the constitutional requirement of just compensation. They are (1) the value of the land taken, and (2) damages to the remainder. Section 16, supra, provides that evidence as to the plan of the improve-, ment is relevant to the determination of both types of compensation, and it specifically authorizes the jury to consider the deprivation of any right of access in determining the damages to the remaining property. Item (2) of section 16 is applicable only to the situation described in item (3), i.e., where the property sought to be condemned constitutes a part of a larger tract. If the state should take the entire property, no question as to deprivation of right of access could arise. However, item (2) was appropriately inserted in the statute to cover cases in which an old conventional highway is "established" as a throughway and in which case, as we have held, there would be a "taking" of the preexisting easement appurtenant to the land not taken. The statute does not provide or imply that damages by reason of deprivation of right of access shall be fixed separately from other damages to the property not taken, but only that such evidence is relevant in the assessment of such damages. Any other construction would imply an intention on the part of the legislature to confer a gratuity on the owner over and above the limits of just compensation, and would impliedly authorize a duplication of the same element of damages under items (2) and (3) of section 16. In any event, we think it was a question of fact whether the market value of the land not taken was affected by the "more complete severance" resulting from the non-access character of the highway appropriated. The legal

situation is analogous to that presented in *Cooley v. Boston & Maine Railroad,* 303 Mass 371, 21 NE2d 953, 122 ALR 1166. A railroad right-of-way which had been acquired by eminent domain bisected the owner's land. The Supreme Court, by Justice Qua, said:

"* * * In Googins v. Boston & Albany Railroad, 155 Mass. 505, at page 506, 30 N. E. 71, at page 72, this court said, with citation of previous cases, 'in general, when land is taken for a railroad, and no right of crossing is reserved in the location, or ordered by the county commissioners, it is not subject to such a right, even if without it an owner will be cut off from access to his land.' The damages awarded to the landowner include this element of loss. * * *"

The cases on this point are not entirely in harmony, but the reasoning of the Massachusetts case seems to us conclusive when applied to the taking by eminent domain of a non-access highway, for no right of access can be implied contrary to the express provisions of the statute. See 122 ALR 1171, note; 44 Am Jur, Railroads, § 117, p 329. It follows that the damages awarded to a land owner may include an element of loss by reason of a depreciation in the market value of the remaining land by reason of the peculiar nature of the appropriation.

■ In *Portland-Oregon City Ry. Co. v. Penney,* the railroad corporation brought an action to condemn a right-of-way through plaintiff's land. The condemnation for such a purpose involved a limitation of access to the strip condemned, somewhat analogous to the limitation involved in the establishment of a non-access highway. The court said:

"The measure of damages is the actual cash market value of the strip taken and the deprecia-

tion in market value of that portion of the tract not actually included in the right of way, which damages are sometimes termed incidental damages; * * *." *Portland-Oregon City Ry. Co. v. Penney,* 81 Or 81, 158 P 404. See also *Portland & O. C. Ry. Co. v. Sanders,* 86 Or 62, 167 P 564.

This general rule was invoked in *People v. Al G. Smith Co., Limited,* supra, 86 Cal App2d 308, 194 P2d 750, where the state condemned the access rights of the defendants in a conventional highway, thereby converting it into a freeway. The only issue related to the effect upon the land outside of the limits of the highway. The court held that the facts brought the case within the rule that " 'Where private property is taken for a public use and damage results to the remaining property of the landowner, compensation for such damage must be awarded which is measured by the diminution in value of that property which remains.' " Since, in that case, the only right taken was the right of access, the case is authority for the proposition that the extinguishment of such right is relevant on the issue of damage, if any, to the remaining property. The same rule is followed when condemnation is brought to acquire a conventional highway. *Pape et al. v. Linn County,* 135 Or 430, 296 P 65. We hold that the peculiar character of the appropriation is relevant to the issue of damages to the portion of the land not taken.

█ Returning to the instruction given in the case at bar, we see that the instruction was limited to the proposition that there was no separate property right in the nature of an easement. It was the nonexistence of an easement which was not to be considered in determining the fair cash market value of the defendant's property. It is true that the instruction

might better have clearly distinguished between the existence of an easement on the one hand, and the question of a possible depreciation of the market value of the remaining land, on the other. The court did not say that there could be no depreciation in the market value by reason of the nature of the condemnation. The exception taken by the defendants did not call to the attention of the court the distinction between the taking of an easement and the depreciation of market value, nor did the defendants request any instruction to the effect that the jury might consider the non-access character of the land taken, in determining the depreciation, if any, of the market value of the remaining land. However, the court did instruct, in general terms, that the defendants were entitled to compensation measured by the fair cash market value of the land actually taken "plus the amount, if you find there is any, by which the fair cash market value of the remainder * * * has been depreciated solely as the result of the appropriation * * *." Again, the court instructed the jury to determine the damages, if any, to the property not taken, on account of the rights asserted by the Highway Commission. Under the instructions, we think the jury were entitled to consider the effect of the non-access quality of the condemnation in determining the depreciation, if any, in the remaining property, and we find no evidence that they may not have done so. See *State ex rel. Sullivan v. Carrow,* 57 Ariz 434, 114 P2d 896; *Boxberger v. Highway Commission,* 126 Colo 526, 251 P2d 920; *Case v. State Highway Commission,* 156 Kan 163, 131 P2d 696. The giving of the instruction to which exception was taken did not constitute reversible error.

## SEPARATE VALUATION AND AWARD

The proposition most earnestly urged by the defendants is that the court erred in refusing to permit the three sets of defendants; one, the owners; two, Patzer; and three, Winkenwerder, separately, to plead and prove their separate damages and to receive a separate award by the jury. Thus they challenge the instruction that the award should be made by the jury in a single lump sum. Since the owners are the only appellants, we limit the inquiry to a consideration of their rights. The situation of the owners is clear. They held the fee, subject to whatever rights there were in the two leases, Patzer and Winkenwerder. The lease from the owners to Winkenwerder was for a period of three years, ending on 14 November 1952. It was drawn along conventional lines, with the possible exception of a provision to the effect that the lessee expected to secure a license to sell alcoholic beverages and that if he failed to secure the license, he should have an option to cancel the lease. The lease to Patzer was somewhat more complicated. The term was for 10 years, ending on 31 August 1958. The lease recited that it was contemplated that the lessee would erect a building of a size 30 feet by 60 feet to cost approximately $10,000. At the expiration of the lease the lessee agreed to sell, and the lessors to buy, the building, at a price of $5,000. The other provisions of the lease were of standard character. Both leases were introduced in evidence. Evidence was received as to the effect of the leases upon the market value of the whole. Much of it was relevant as to the highest and best use to which the land was adapted. An expert witness for the state testified that ground leases were the best use to which

portions of the land could be put. Evidence was offered as to the present value of the building constructed by Patzer, as of the date of the appropriation. The court instructed the jury that they might consider his leasehold interest and also "as a part of the whole, the fair cash value of the improvements * * *." The court also instructed that if any part of the land included in the Winkenwerder lease was taken, they should consider his leasehold interest. Thus, it is apparent that the jury were permitted to consider the elements which would affect the market value of the tract as a whole. The complaint of the owners on this phase of the case is not that such evidence was excluded but that the various defendants were improperly deprived of a separate proof of the value of the separate interests and a separate assessment of damage as to each interest.

In *State ex rel. McCaskill v. Hall*, 325 Mo 165, 28 SW2d 80, 69 ALR 1256, proceedings were brought to condemn a single tract of land in which the fee was held by one group of persons; leases were held by others (one lease to run to the year 2001), and subleases were owned by others with option of renewal. Some interests were held by trustees and some of the leaseholds were subject to mortgages. A sublessee brought mandamus to compel a separate assessment of the value of his leasehold. He asserted that a failure to separately assess his damage would be violative of his rights under state and federal constitutions. He asserted that in securing his proper portion of a lump sum award, he would be subjected to the expense of litigating with others who also claimed interests in the land, for which expense he would receive no compensation, and he argued that by reason

of such litigation he might be dispossessed long before he received compensation. The Missouri court cited as the general rule the following which is taken from Lewis on Eminent Domain:

> "'When there are different interests or estates in the property, the proper course is to ascertain the entire compensation as though the property belonged to one person, and then apportion this sum among the different parties according to their respective rights. The value of property can not be enhanced by any distribution of the title or estate among different persons, or by any contract arrangements among the owners of different interests. Whatever advantage is secured to one interest must be taken from another, and the sum of all the parts cannot exceed the whole.'" 2 Lewis on Eminent Domain, 3d ed, § 716, p 1253.

The same rule is laid down in Nichols, The Law of Eminent Domain, 3d ed, § 12.36, as follows:

> "It was formerly looked upon as one of the most firmly established principles of the law of eminent domain, and it is still the law in the usual case, that when a tract of land is taken by eminent domain, as the land itself is taken by a paramount title rather than the separate estates of different persons having interests in the land, the compensation awarded is for the land itself, and not for the sum of the different interests therein. The duty of the public to make payment for the property which it has taken is not, it is said, affected by the nature of the title or by the diversity of interests in the property. The public pays what the land is worth, and lets the amount so paid be divided among the various claimants, according to the nature of their respective estates. The rule was expressed in the following language:
>
> "'No contracts between the owners of different interests in the land can affect the right of the government to take the land for the public use,

or oblige it to pay by way of compensation more than the entire value of the land as a whole.' "

To the same effect see Orgel on Valuation Under Eminent Domain, § 107, p 362; 29 CJS, Eminent Domain, § 197, pp 1102-3; *Morgan v. Willman,* 318 Mo 151, 1 SW2d 193, 58 ALR 1518, 1526; *Barnes v. City of Springfield,* 268 Mass 497, 168 NE 78; *Eagle Lake Improvement Co. v. United States,* 160 F2d 182 (CCA 5th); *Grand River Dam Authority v. Gray,* 192 Okla 547, 138 P2d 100; *Herr v. Board of Education,* 82 NJL 610, 83 A 173; *In re Allen Street and First Avenue,* 256 NY 236, 176 NE 377; *Phillips v. United States,* 151 F2d 645 (CCA 7th); *United States v. 25.936 Acres of Land,* 153 F2d 277, (CCA 3d); *Ross v. The Elizabethtown and Somerville Rail Road Co.,* 20 NJL 230; *State by Youngquist v. Anderson,* 176 Minn 525, 223 NW 923; *State ex rel. Long v. Superior Court,* 80 Wash 417, 141 P 906; *St. Louis v. Rossi,* 333 Mo 1092, 64 SW2d 600.

██ The defendant owners, confronted by this impressive weight of authority, nevertheless argue that a lump-sum award amounted to a taking of their property without just compensation under Oregon Constitution, Article I, § 18. They call attention to the wording of the statute under which the action was brought. OCLA, § 100-116, as amended by Oregon Laws 1947, ch 283, p 391, outlines the procedure to be followed "to acquire real property". It refers to the compensation to be paid "therefor" and to the damages for the taking of "such real property". It then authorizes "appropriate suit or action" for the condemnation "of such interests as such owner or owners may have in said real property". The defendants assert that the constitution deals with per-

sons, not tracts of land, and quote from *Boston Chamber of Commerce v. Boston,* 217 US 189, 54 L ed 725 (1910), wherein such language was used. In that case it is said that the constitution does not require a disregard of the mode of ownership, or require a parcel of land to be valued as an unencumbered whole when it is not held as such. The court also said that the question is what the owner lost, not what the taker gained. However, it is unnecessary for us to decide whether the constitution requires the valuation to be in a lump sum. The very great weight of authority establishes that the constitution permits valuation in that manner. It is true, as the defendants say, that the constitution deals with persons, but the condemnation statutes deal with land. The action may be commenced, as in many tax statutes, against the person or persons in whose name the record title appears. The statute adds that lessees or other persons having or claiming an interest may be included. Such proceedings have repeatedly been held to be in rem, although, of course, the pleadings, as a rule, though not always, carry the names of the owners as defendants. 2 Lewis on Eminent Domain, § 512, p 928. Citing many cases, *State ex rel. Long v. Superior Court,* supra, 80 Wash 417, 141 P 906; *Grand River Dam Authority v. Gray,* supra, 192 Okla 547, 138 P2d 100. In *Eagle Lake Improvement Co. v. United States,* supra, 160 F2d 182, 184, (CCA 5th) the court said:

"\* \* \* A condemnation proceeding is an action in rem. It is not the taking of rights of designated persons, but *the taking of the property itself.* \* \* \*"

*Duckctt & Co. v. United States,* 266 US 149, 69 L ed 216.

■ The statutory provision that the defendant may answer and allege the true value of the real property and the damage resulting, is not inconsistent with the holdings that it is property which is taken, and that the taking of property is the object of the proceeding. Of course, land cannot answer the complaint.

In some states there are statutes expressly providing for the separate valuation of separate interests in the same tract. See *State v. Platte Valley Public Power & Irrigation Dist.*, 147 Neb 289, 23 NW2d 300; *Town of Perry v. Thomas*, 82 Utah 159, 22 P2d 343; *State ex rel. La Prade v. Carrow*, 57 Ariz 429, 114 P2d 891. There is no statute authorizing or requiring such procedure in this state.

The defendants rely especially upon *Boston Chamber of Commerce v. Boston*, supra. The Chamber of Commerce owned land in the heart of Boston which it had acquired by deed, and which deed reserved to the grantor rights-of-way; light and air, over approximately one-fifth of the tract. Thereafter the city of Boston laid out a public street over most of the land which was covered by the private easements. The Chamber of Commerce and the holder of the easement, which was appurtenant to the land of the third party, filed a petition for assessment of damages, and astutely stipulated that the damages might be awarded in a lump sum to all parties interested, without apportionment. The building of the Chamber of Commerce fronted upon the private easement, and the keeping of the space open for travel was of great benefit to it. On the other hand, the private easement was of great benefit to the dominant tenement, but obviously the public street over the same area was of equal value. It was stipulated that if the separate interests

of the parties were valued separately, the damages would be $5,000, but it was contended that if the property condemned was treated as if it were the property of one owner in fee simple, the value of the land taken would be $60,000. Under these peculiar circumstances, the Supreme Court of Massachusetts held that the separate interests should be valued separately. The result was a drastic reduction in the sum total of the awards, which was far below the market value of the tract treated as a fee under single ownership. It seems apparent that the defendants in the case at bar can gain no comfort from that case.

It has been suggested that *Mayor and City Council of Baltimore v. Latrobe,* 101 Md 621, 61 A 203, is contrary to the general rule which requires a lump-sum award. This is by no means clear. In any event, that case involved tenures which were peculiar to ancient land holdings in the state of Maryland which were later abolished. The fee was subject to an "unredeemable ground rent for 99 years, renewable forever." The court recognized the validity of the general rule as we have stated it, and the real issue considered in the case related to the proper apportionment of compensation between the owner and the holder. The contention of the condemnor was that the owner was not entitled to any compensation under the circumstances. The court rejected this contention and considered at length the relative interests of the parties, and concluded "that in this case the rent can and should be apportioned" in view of the fact that a part only of the land had been taken. The case is distinguishable. In a few instances it has been held that when the owner of land grants an ease-

ment with the provision for reversion in the event that the grantee ceases to use the property for the purpose for which the easement was granted, and especially where the land taken is shown to be mineral-bearing and of value separately from the use of the surface, the owner of the reversion should have a separate valuation. These cases also frequently fail to distinguish between a separate valuation on the one hand, and the apportionment of a lump-sum award on the other. There are, of course, cases in which juries or commissioners are authorized by statute, not only to determine lump-sum valuation, but also to apportion the award. But this does not imply any rule that the separate amounts apportioned to the owners of different interests may exceed the market value of the whole.

In *United States v. 250 Acres of Land,* 43 F Supp 937 (DC Tex), one person owned the mineral rights, and the other, rights in the surface. The district court held that the commissioners should report, not only the value of the entire title, but also the value of each separate interest. But it is apparent that the court was considering the matter of apportionment rather than the valuation of the separate interests, for it said:

> " 'The assumption that the commissioners * * * would find a greater value for the whole tract than they would if they proceeded as indicated by the suggested rule is without merit.' "

■ The decisions of this court as to the measure and amount of compensation clearly imply that all interests in the land are to be valued in a lump sum. The measure of damages is the actual cash market value of the land, condemned, plus the depreciation, if any,

of the value of the land not taken. *Portland-Oregon City Ry. Co. v. Penney,* supra, 81 Or 81, 158 P 404; *State ex rel. v. Hawk et al.,* 105 Or 319, 208 P 709; *Keane et al. v. City of Portland et al.,* 115 Or 1, 235 P 677; *State v. Mohler et al.,* 115 Or 562, 237 P 690 239 P. 193; *La Grande v. Rumelhart et al.,* 118 Or 166, 246 P 707. The matter of setting off direct benefits against damages to the land not taken is not involved in this appeal and is not discussed.

We have reserved until now the consideration of *Portland v. Postill,* 123 Or 579, 263 P 896. In that case the city instituted condemnation proceedings under the provisions of its charter. The property was owned by a corporation and Postill was the lessee of a building thereon. Based on a report by the city engineer, and after notice and hearing, the council fixed the amount of compensation for the taking. Pursuant to authority of Oregon Laws 1925, ch 294, the lessee Postill appealed to the circuit court and alleged that the city had awarded the damages to the owner and none to him. He set up his 10-year lease and described substantial improvements made by him on the leased premises and concluded with a prayer for a separate assessment of his damages. The case was tried by a jury which fixed the total amount of compensation for the taking and in addition separately determined the amount of damage suffered by the lessee, which was included in the total. The owner was not a party to the proceedings in the circuit court and could not be bound by the apportionment. Consequently the judgment recited that the apportionment made by the jury to the lessee was advisory only. A lump-sum judgment was entered "to be paid * * * to whomsoever may be hereafter ascertained to be entitled thereto * * * and it is further intended that the division of

said gross amount shall be hereafter made when all of the parties shall have an opportunity to be heard thereon." Postill was awarded his costs.

From this judgment Postill alone appealed to this court. The argument on appeal was not based on any claim that separate awards must be made or could be made in amounts exceeding the total value of the property if held in a single ownership. The argument was that the charter required separate apportionment of the share of the lessee, to which the lessee asserted a constitutional right. This court held that the charter contemplated the award of damages in a lump sum and that the segregation be made after the gross sum had been ascertained and deposited with the city treasurer.

We quote:

> "The law authorizes in effect, as we take it, an investigation and trial as to the gross amount of damages to all interested in the property and then says to the claimants: 'Gentlemen here is a fund in money deposited with the treasurer sufficient to cover all damages which any one of you may sustain. If you differ among yourselves as to your individual shares, we have left you a remedy as to each other, but permit the improvement to go on.' "

The court further intimated that if controversy should arise between the owner and the lessee as to their respective shares, it should be settled as provided in the charter. The charter provided that such controversy should be determined by the council after hearing, and subject to appeal, and added, " 'or the council may direct that a suit of interpleader or other proceeding be instituted.' "

We are not concerned with the interpretation of the city charter in the Postill case, but that decision did directly hold that the making of a lump-sum award

subject to later apportionment was "not in violation of any prescription of the Constitution." That case is decisive on the constitutional issue which is here presented. On the issues of statutory construction and procedure, we rely upon authorities cited from other jurisdictions.

■ We conclude that, except perhaps under extraordinary circumstances, when actions are brought for condemnation of land, which are triable before a jury, that body should return a verdict in a single lump sum, representing the fair market value of the land taken, and the net depreciation, if any, of the part not taken. In this case we find no circumstances requiring any departure from the general rule.

## PROCEDURE FOR APPORTIONMENT

■■ There remains the important question raised by the fourth assignment of error as to how, when, and by whom, the apportionment of the damages should be made, as between the lessors and the several lessees. The Oregon statute under which the action was brought, and the judicial opinions from other states, demonstrate that the condemnation proceedings, as such, ended when the jury made its award and the damages assessed were paid into court by the state. At that point judgment is entered appropriating the property to the state.

The statute provides:

"Upon the payment into court of the damages assessed by the jury, the court shall give judgment appropriating the lands, property, rights, easements or interests in question, as the case may be, to the state, and thereafter the same shall be the property of the state absolutely and may thereafter be used for any public purpose.

"Either party to the action may appeal from judgment therein, in like manner and like effect as in ordinary cases, but such appeal shall not stay

the proceedings so as to prevent the state highway commission from taking such real property into possession, and using the same for the purposes for which the same is being appropriated." Oregon Laws 1947, ch 283, p 392.

Excerpts from Nichols on Eminent Domain support our conclusion:

"The fact that property taken under the power of eminent domain is subject to a leasehold interest ordinarily has no effect on the valuation of such property insofar as such valuation is based on multiple ownership. The award stands in place of the land and the owners of each interest may recover out of the award the same proportionate interest which they had in the land condemned. * * *" 4 Nichols on Eminent Domain, § 12.42, p 162.

The learned author then points out that both lessor and lessee are entitled to share in the award according to their respective interests. He then says:

"* * * It follows that the award may be apportioned in accordance with the respective interests of such owners. The matter of such apportionment is of no concern to the condemnor and is a problem in which only the claimants are involved. * * *" 4 Nichols on Eminent Domain, § 12.42 [2], p 172.

Again, on the authority of cases cited, it is said:

"The proper apportionment of the fund awarded concerns only the claimants, and the condemning party has no interest in such apportionment." 29 CJS, Eminent Domain, 1103, § 197. See also *Lambert v. Giffin,* 257 Ill 152, 100 NE 496.

█ While recognizing that a court in the proceeding to assess damages has no equitable powers, 18 Am Jur, Eminent Domain, p. 1007, § 364, the authors of that text continue"

"The condemnation proceeding outlined by some statutes is not designed to be used to determine

rival claims; those are to be determined in a separate proceeding, and any order distributing the fund in the condemnation proceeding would not be final. It has been held that in the absence of a statutory provision, the courts should permit anyone claiming an interest in the fund to intervene by petition or interpleader and have his rights determined, and if the court has jurisdiction, its judgment would no doubt be binding upon the parties regularly before it." 18 Am Jur, Eminent Domain, § 368, p 1009.

The same rule is recognized in the federal courts:

"No matter how large the number of persons who claim interests, where their rights are derivative and the award is for the whole estate, proceedings may be had to apportion the award. In such proceedings, the condemnor has no interest. Having secured a decree which vests title in him subject to the payment of the compensation, he is not interested in the manner in which the money he has paid for the entire title is apportioned between various claimants. Nichols, Op. Cit., Loc. Cit., Sec. 5.3 (4), p. 51." *United States v. Adamant Co.,* 197 F2d 1. See also *Davidson v. Texas & N.O.R. Co.,* 29 Tex Civ App, 67 SW 1093.

Since the condemnation was complete when the money was paid into the court, it follows that the function of the jury was, by that time, fully performed.

■ Issues remain for determination, but they are not issues in a condemnation action, for in such actions, the state is a vitally interested party, and in the subsequent apportionment of the fund between parties who have appeared in the case, the state is not interested. The vital question is not concerning the duty of the state;—it concerns the duty of the court. As applied to the pending case, the question is limited to the situation in which all of the persons having property rights in the land are before the court as parties. It

may be that the state would be interested in apportionment proceedings if claimants who had not been parties in the condemnation action were permitted or required to intervene in proceedings for apportionment and to litigate questions of title in the land, prior to condemnation; but that problem is not now before us.

Various procedures have been approved for the apportionment of the fund. If the fund has been paid to one of the owners, another, who had a property right in the land, has been permitted to sue for money had and received, an action based upon equitable principles. *Harris v. Howes,* 75 Me 436. We think that a rule which would require this type of procedure would be unjust to all parties having interests in the property. The one to whom the money was paid may have spent or concealed it and the other should not be put to the expense of an independent suit to secure his share in the fund which represents his former interest in the land. Furthermore, the one to whom the money was paid should not be subjected to two suits by reason of the condemnation, when one would suffice.

In a number of cases it has been held that the money should be paid to the court and the parties permitted or required to interplead. From the note in LRA, 1917 A, we quote the following:

> "In some statutes the condemnation proceeding is not designed to be used to determine rival claims, and provision is made for payment into court whenever there are more than one claimant, and the court may in a separate proceeding finally determine the rights of the respective claimants. Of course, under such a statute an order of the court in the condemnation proceeding making a distribution of the fund would not be final. In some cases the issues between rival claimants have been raised by interpleader before the fund is paid out, and

while the court, perhaps, have not been called upon to decide the question of finality of the judgment in such cases, there can be no doubt that all matters thus at issue which have been decided are res judicata. And it has been held that in the absence of a statutory provision the courts should permit anyone claiming an interest in the fund to intervene by petition or interpleader and have his rights determined. This would bring the issues clearly before the court, and if the court has jurisdiction its judgment would no doubt be binding upon the parties regularly before it." *Clark v. Meyerdirck,* 107 Md 63, 68 A 141; *Hilton v. St. Louis,* 99 Mo 199, 12 SW 657.

In *Harris v. Howes,* supra, the court authorized an action for money had and received, but it stated that a bill in equity would also lie for recovery for the proportionate share by lessee.

In *Mayor and City Council of Baltimore v. Latrobe,* supra, 101 Md 621, 61 A 203, the court said:

"* * * although the proceeding is not on the equity side of our courts, when damages are to be awarded for property thus taken, regardless of the wishes of the owner, equitable principles can and should be applied. The effort should always be to place an owner of land in as favorable position as he occupied before, so far as that can be done by the compensation to be awarded him. Our decisions show that although the jurisdiction conferred on our courts in condemnation proceedings is special and limited, yet great latitude is given them to fully and properly dispose of all questions that are within that jurisdiction. The right to review and correct the award of damages and the assessment of benefits is expressly provided for by the statute now before us, and the courts usually have such powers in this class of cases. There can therefore be no reason why they cannot apply equitable principles when the circumstances require it, in

order to do full justice to the parties, as we are of the opinion they do in this case. * * *"

In *Turner v. Woodard,* 259 Fed 737 (CCA 1st), the United States instituted condemnation proceedings against land in which mortgagees and lien creditors held interests. In that case the parties had stipulated that the only issue to be submitted to the jury should be the value of the property, and that the court should apportion the fund. The United States was not a party to the stipulation. The court distributed the fund. We quote:

"* * * It is also obvious that if, as the result of the proceedings, such fund should be paid into court, the determination of the rights of the parties claimant, inter sese, was necessarily a proceeding in equity. Only in equity could the rights of the mortgagees and of attaching creditors be determined. Hooven, Owens & Rentschler Co. v. Featherstone's Sons, 111 Fed. 81, 87, 49 C.C.A. 229; Spring Garden Ins. Co. v. Amusement Syn. Co., 178 Fed. 519, 530, 102 C.C.A. 29; Bates v. Boston El. Ry., 187 Mass. 328, 341, 72 N.E. 1017; Wood v. Westborough, 140 Mass. 403, 5 N.E. 613; Dwight v. County Com'rs, 7 Cush. (Mass.) 533."

In *Department of Public Works and Building v. Porter,* 327 Ill 28, 158 NE 366, 369, the court said:

"It was permissible for the parties to agree that the money awarded in the condemnation proceeding be paid into court, as was done in this case, and it was proper practice for the court to determine, after the condemnation proceeding was concluded and the money paid into court, who were entitled to the funds and what disposition should be made of the same. The money paid into the court represents the land taken by condemnation. City of Chicago v. Gage, 268 Ill. 232, 109 N.E. 28." See also Bothwell Co. v. Bice, 247 Fed 60; *Ross v. Elisabethtown and Somerville Rail Road Co.,* 20 NJL 230.

Finally, in *Pacific National Bank of Seattle v. Bremerton Bridge Co.,* 2 Wash 2d 52, 97 P2d 162, 165, the court said:

"* * * This court has held that, where a judgment in eminent domain proceedings is for the full value of the land appropriated, and the amount is paid into court, the apportionment of the fund between rival claimants not only flows from the statute but is a matter of general equity without reference to the statute, and that it is immaterial whether or not the claimant was made a party to the original proceedings. North Coast R. Co. v. Hess, 56 Wash. 335, 105 P. 853; State ex rel. Long v. Superior Court, 80 Wash. 417, 141 P. 906. That principle is peculiarly applicable here."

From *State ex rel. Long v. Superior Court,* 80 Wash 417, 141 P 906, we quote:

"* * * When, therefore, a lessee has not made his interest to appear of record, and the court has made an assessment in gross, the claim of the lessee is not against the petitioner, but against the fund. He may appear in the original proceeding; he may ask an apportionment of the award under sections 929-931; he may proceed in equity independent of the statute Harris v. Howes, 75 Me. 436), or by way of an action for money had and received (Lewis on Eminent Domain [3d Ed.] § 719). The lessees have not seen fit to pursue any of these remedies. Inasmuch as they might have done so, and inasmuch as the petitioner might, had it known of their interest, made them parties, it follows that, having present notice of their interest, it may compel them to come in and take their apportionment of the gross award, under section 930 of the Code. Procedure in eminent domain is statutory. When the petitioner has followed the statute it has discharged its duty to the landowner, and it is not bound to answer in an action at law or in equity to any one claiming a misdirection or illegal apportionment or award of the fund paid into the court. It is not

responsible for the delinquencies of the parties claimant, nor is it answerable except upon appeal for the errors or omissions of the court. * * * "

In *North Coast Ry. Co. v. Hess,* 56 Wash 335, 105 P 853, it was held that the power of the equity court to determine the distribution of the fund was inherent, and existed apart from statute, and, since the fund stands in place of the full value of the land, it is the duty of the court to dispose of the fund in the same manner as it would have disposed of the land for which the fund is substituted.

 From the authorities cited, and as a matter of sound reasoning, we find that after the state has paid into court the sum awarded by the jury, the condemnation proceedings, as such, are at an end, and judgment vesting title in the state follows. But this leaves in the court a fund in which the former lessor and lessees have interests which are the equivalent in money of the interests formerly held in the land. But while the interests in the land were easily defined by reference to the leases, the determination of the relative interests in the fund may involve the most intricate and difficult problems, for the determination of which, juries are unsuited. The interposition of equity is required. If, as indicated by the authorities, one claimant may implead others who were not parties to the condemnation action and may invoke the aid of equity, we think it follows a fortiorari that similar equitable procedure should be available to those who were parties to the condemnation. In cases of this kind the state is not interested in the apportionment proceedings, nor is it responsible for the expense involved therein. But we think that the making of the apportionment is ancillary to the condemnation proceedings and should be determined without the necessity of bringing a new suit

or action. The action of the state has worked a substitution of unknown rights in a fund for known rights in the land, and the law should not throw the parties out of court and require them to institute a separate and independent suit in equity, or to bring an action for money had and received, which would be neither plain, speedy nor adequate, when all the parties are before the court and when timely request is made, as was done in this case, for further proceedings apportioning the award.

■ In addition to the above illustrations, it should be pointed out that the distribution of a condemnation award is analogous to a bill in interpleader, for the condemnor who pays the amount of the judgment into court is discharged from further liability and the land is appropriated to the use of the condemnor. Thereafter, the conflicting claims, if any, can be dealt with as in proceedings following the discharge of the plaintiff from liability by deposit into court of the contested fund in a bill of interpleader. The litigation then proceeds among the claimants to the fund. Since a bill of interpleader is an equitable proceeding, the apportionment of a condemnation award would be similarly an equitable proceeding.

■ The money in the hands of the court was in every true sense a trust fund. Our statute provides that:

"* * * in an action at law where the defendant is entitled to relief, arising out of facts requiring the interposition of a court of equity, and material to his defense, he may set such matter up by answer, without the necessity of filing a complaint on the equity side of the court; and the plaintiff may, by reply, set up equitable matter, not inconsistent with the complaint and constituting a defense to new matter in the answer. Said reply may be filed to an

answer containing either legal or equitable defenses. The parties shall have the same rights in such case as if an original bill embodying the defense or seeking the relief prayed for in such answer or reply had been filed. \* \* \*'' OCLA, § 9-102.

The adjustment of the rights of the claimants in the manner proposed, if not technically within the letter of the statute, is at least within its spirit.

■ Another statute provides:

"When jurisdiction is, by the organic law of this state, or by this Code or any other statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding be not specifically pointed out by this Code, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code." OCLA, § 13-715.

We hold that the trial court was authorized to retain jurisdiction and that it should have conducted a supplemental hearing in this case for the purpose of apportioning the lump-sum award among the owners and lessees as their interests may appear, exercising the powers of equity to that end. Similar action was taken by this court in *Spencer v. City of Portland,* 114 Or 381, 235 P 279, where we said:

"In the event that the appellate procedure in the matter of eminent domain is not included in the statutory provisions, the general rules of practice in similar cases are adopted: \* \* \*.''

### OTHER ASSIGNMENTS OF ERROR

■ The third assignment of error criticizes the instruction which was given concerning a view of the premises. As we read it, the court did not tell the jury that the view of the premises was evidence. In effect, they were instructed that the view might be

considered as an aid in understanding the evidence. The assignment is without merit.

■ The fourth assignment raises issue already considered and determined herein. The value of the property is not that which is placed thereon by the testimony of the owners, although their testimony is competent. The measure of damages is as previously set forth herein.

■ The fifth assignment asserts that the court erred in denying to the Burk interests a separate allowance of attorney fees. In the judgment of condemnation, jurisdiction was retained for the determination by the court of the amount of the attorney fees at a supplemental hearing to be held upon that issue. Thereafter an order was made as follows:

"Attorneys' fees allowed in one sum for all the attorneys representing defendants Burk, Couey and Rodgers, defendant Patzer and defendant Winkenwerder 4500.00"

We do not know what matters were considered relevant by the trial court in fixing the lump-sum fee. Although it was proper to fix the compensation for the taking of the property as if it were held in a single ownership, the fixing of attorney fees was a different matter. The statute contemplates that the court shall fix "a reasonable attorney's fee". OCLA, § 100-116, as amended by Laws 1947, ch 283. But in this case it is apparent that the interest of the several lessees was in some respects adverse to that of the owners. The owners and the lessees were entitled to separate representation by counsel, and the work of counsel was therefore more involved than it would have been had there been no separate interests in the property. If the trial court considered this aspect of the case in

fixing the lump-sum fee, then the total award should stand as made, and the sum fixed should be apportioned to the owners, on the one hand, and to the separate lessees on the other, at the time when the apportionment of compensation is made. If, however, the award of an attorney's fee was made without regard to the additional legal services required by reason of the presence of adverse parties, then the total award should be modified to conform to this opinion. This is a matter peculiarly within the control of the trial court.

We have already disposed of the sixth assignment of error.

There is no merit in the seventh assignment which complains of the exclusion from evidence of a letter written by an attorney, by the Highway Commission.

The cause is remanded to the circuit court with directions to apportion the award of compensation between the owners and the defendant Patzer and between the owners and the defendant Winkenwerder, as their several interests may appear, and to apportion a reasonable attorneys' fee between the parties as may be equitable.