Argued August 18, affirmed September 22, reconsideration denied
November 5, petition for review denied December 23, 1975

STATE EX REL STATE HIGHWAY
COMMISSION, *Appellant, v.* BOOTHMAN ET AL
(No. 21080), *Respondents.*

540 P2d 1020

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for appellant. On the brief were Lee Johnson, Attorney General, W. Michael Gillette, Solicitor General, John R. McCulloch, Assistant Attorney General, and Timothy Wood, Assistant Attorney General, Salem.

*George H. Corey,* Pendleton, argued the cause for respondents. With him on the brief were Corey, Byler & Rew and Steven H. Corey, Pendleton.

Before SCHWAB, Chief Judge, and LANGTRY and LEE, Judges.

LANGTRY, J.

This is an appeal by the State Highway Commission from a compensation award made by jury verdict and judgment in a condemnation case. The Commission condemned 37.5 acres of defendant Boothmans' property in connection with construction of the Ladd Canyon Part of Interstate Highway 30 freeway. The freeway followed a previously existing highway and cut across the defendants' cattle ranch, leaving approximately 1,100 acres on the west side of the highway and 3,900 acres on the east side. Prior to the freeway construction defendants had a 25-foot farm grade crossing over the old highway. In lieu of this Mr. Boothman testified:

"* * * I expected when the freeway went in that they would at least give me an underpass under the highway, twelve foot concrete box somewhere in that area."

Such a crossing was not provided. Before construction a metal tube to carry the waters of Ladd Creek went under the old highway at the point in question. A new metal tube was constructed under the freeway for the same purpose. It is 240 feet long and is large enough for cattle to pass singly through, but has no lighting. Because it carries water there is no footing for cattle in it other than metal. It is thus slick for the feet of the cattle, it carries a metallic noise, and the cattle cannot see the other end of it as they are driven in. Trial testimony strongly supports the view that under the circumstances existing it is virtually impossible to drive cattle through such a water-carrying, metal tube passageway. A moving picture showing such an attempt is an exhibit.

In the state's second amended complaint it was alleged that the state "will provide a connecting road via frontage roads and the Ladd Canyon Interchange" (an overpass interchange located two miles northerly of defendants' previously existing grade crossing) for access between the remaining parcels of property. On appropriate motions prior to trial the court struck this allegation and allowed defendants to amend their answer to say:

"* * * [Plaintiff] has not provided a connecting road crossing between severed tracts and defendants are entitled to damages therefor."

This matter was deemed denied, and the issue was thus drawn.

The controversy centers almost entirely around these amendments the court allowed to the pleadings and the court's instructing the jury that the defendants

were entitled to damages because the state had not provided a connection. The state requested an instruction on nominal damages, which the court did not give.

After defendants had completed their case-in-chief, the state's attorney offered to stipulate that the defendants could use a different tube which had been constructed under the highway. This different tube is located at the Stockhoff property (see *State Highway Comm.: v. Stockhoff,* 16 Or App 647, 519 P2d 1281, *mandate modified,* 18 Or App 233, 524 P2d 1240, Sup Ct *review denied* (1974)), is approximately a mile away from the nearest point on defendants' property, does not carry water, and is lighted to some degree. Cattle apparently can be induced to pass through it. The state contends it was error for the court not to allow the stipulation.

The stipulation offered was in several forms. At one place counsel offered to stipulate that the Stockhoff tube was one for a public use. The court then observed that evidence it had heard in the *Stockhoff* case would indicate that that tube was established for the private use of Mr. Stockhoff and nobody else. In further colloquy in chambers state's counsel stated that if there was any question about the legal right to use the Stockhoff tube " * * * I could so stipulate on behalf of the plaintiff in this case that Boothman does have this right, absolute right * * *." Then, later in further colloquy the state's attorney said:

"I can stipulate right now * * * that as long as Mr. Boothman owns two pieces on either end of the tube in question, that he can use it * * *

"* * * * *

"* * * as long as any portion of the remaining property on both sides of said highway and served by said culvert are held under a common ownership * * *."

The court finally ruled against any such stipulation and against defendants' having a right to use the Stockhoff tube, not necessarily because the change in position of the state came too late in the trial, but because of the confusion in what the state's attorney was trying to stipulate and the court's own view of the limitations that exist as to use of the Stockhoff tube.

■ With reference to the latter claim of error, we agree with the trial court. First, it is not clear what kind of a right of use of the Stockhoff tube the state's attorney was trying to stipulate. Second, when the state's attorney made the stipulation offer, the complaint in the *Stockhoff* case (the appeal of which is reported at 16 Or App 647, supra) was marked as an exhibit. In the following colloquy counsel and the court read from that complaint that the Stockhoff tube was limited so that if the Stockhoff property did not continue in common ownership on both sides of the road the right to use of the tube would cease. The court repeatedly observed during the lengthy colloquy that if the common ownership of the Stockhoff property terminated and that right ceased it could not believe that a similar right could still continue for all of the public except the Stockhoffs and their successors. The court said it concluded the Stockhoff tube was provided primarily for the Stockhoff property and not the public.

The offer to stipulate was treated as an attempt to amend the state's complaint, and the court refused it. Treated either as a move to amend the complaint or as a "unilateral stipulation" its effect would be the same.① It is a matter in which the court has "discre-

① The word "stipulation" in common parlance is often misused. Perhaps that is why the confusion arose at bar. A "stipulation" which is "unilateral" is a creature of the law which is unknown to us. It is discussed in the Washington case, State v. ■

tion," and is "not reviewable upon appeal unless an abuse of discretion is shown * * *." *McGinnis v. Keen,* 189 Or 445, 221 P2d 907 (1950). We find no error in this regard, as the court properly exercised its discretion. The state supports its position by citing to us *State v. Basin Devel. & Sales Co.,* 53 Wash 2d 201, 332 P2d 245 (1958). There, the court held that, even after trial, a unilateral stipulation, offered by the state's attorney, in mitigation of condemnation damages should be allowed. The case is not in point here, because there was no question in that case of whether the state was seeking to stipulate away someone else's rights, as there is here. Without Stockhoff's being a party to the offered unilateral stipulation, it would have been improper for the court to allow it.

■ The more serious question presented is that involving whether the state can provide something which avoids payment of compensation such as the overpass interchange two miles away as an equal alternative to a direct crossing between parts of a severed agricultural property in this kind of case. ORS 374.085 is the controlling statute. It provides:

"Wherever by * * * construction * * * of a throughway * * * real property, title to which is held under one ownership, is severed and the land is being used for farm or other agricultural purposes, provision shall be made by the Department of Transportation for crossing the highway from

---

Basin Devel. & Sales Co., 53 Wash 2d 201, 332 P2d 245 (1958), and there it is said that the condemnor may "stipulate" to a fact in mitigation of damage in some circumstances and the trial court is in error "in refusing to accept the state's stipulation." 53 Wash 2d at 205. This apparently means that a Washington court must force the condemnee to agree to a fact it does not agree with, for the only definition of the word "stipulation" we find in unabridged or legal dictionaries is that it connotes a binding mutual agreement. Where an offer is made to stipulate as was done at bar, it seems less confusing (as the trial court did here) to treat the offer as a move to amend the appropriate pleading.

one such tract to the other or compensation for the severance of the tract shall be paid. Should such tracts at any time cease to be held under one ownership, the department may terminate and discontinue the road crossings. No such connecting-road crossing shall be used for or in connection with the conduct of any roadside business or enterprise, but shall be available and used solely for passage from one of the severed tracts to the other."

We hold that this statute does not reasonably contemplate that the Commission may escape paying compensation for loss of previously existing direct access from a farm on one side of a new throughway to the rest of the farm on the other side of the new throughway by offering a roundabout way over an interchange (or, for that matter, a tube designed for cattle passage) which is located an unreasonably long distance away.

This statute apparently has not been construed before although it is a part of the original Throughway Act which was enacted in Oregon in 1947.

*State Highway Com. v. Burk,* 200 Or 211, 265 P2d 783 (1954), involved a situation where a throughway severed a tract of land. The report does not say whether it was farm land. The authority for condemnation there was the general Throughway Act here under consideration but ORS 374.085 was not directly mentioned. The court there said:

"* * * We again quote from the article in Stanford Law Review, cited supra:

" 'As a final case, consider the situation where the right-of-way purchased runs right through *B's* land. In the case of a normal, unrestricted-access highway, *B* will be paid for the land actually taken and also "severance" damage for the separation of the property. If the highway is to be of limited-access design, with *B* having no right of access, the severance of

the two parcels will be more complete. *B* should be, and is, paid for this more complete severance, but this is on the basis of severance damage alone and not on any theory of right of access being denied.' 3 Stanford Law Rev, Freeways, p 308.

"In this case, the so-called non-access road deprives the defendants of all direct access thereto, although they will still have the possibility of access to the new highway by a long and circuitous route. * * * In any event, whether the market value of the land not taken was affected by the 'more complete severance' resulting from the character of the highway appropriated, was a question to be determined by the jury upon the evidence. * * * The statute does not provide or imply that damages by reason of deprivation of right of access shall be fixed separately from other damages to the property not taken, but only that such evidence is relevant in the assessment of such damages * * *." 200 Or at 235-37.

Referring to the above language in *Burk,* the court in *Highway Com. v. Central Paving Co.,* 240 Or 71, 76, 399 P2d 1019 (1965), a case which is not in point at bar on the facts, said:

"Defendants rely upon *State Highway Commission v. Burk,* 200 Or 211, 265 P2d 783 (1954). The *Burk* case is distinguishable. There the new highway was constructed through the center of the owner's property, making it necessary for the owner to take a circuitous route to get from one parcel to the other. In such a case the owner is entitled to recover on the basis of severance damages rather than on the basis of a deprivation of a right of access." (Footnote omitted.)

In the case at bar, the state's principal position was that the overhead interchange two miles distant was all that was required of it and, at best, defendants

could recover only nominal damages for having to drive or transport their cattle and equipment over the circuitous route.

Cattle necessarily have to be moved across the throughway on a seasonal basis in order to properly utilize the ranch. Cogent evidence was produced by defendants that it would be unlikely cattle could be driven over the overpass because they would be frightened at the sight of the fast-moving traffic below. Even if they could be induced to cross, evidence was that it would take extra riders and time for such seasonal drives. The alternative would be to hire stock trucks to move them, with attendant expense and trouble involving turning room on and softness of access roads. Defendant Boothman testified he would have to separate cows and calves sooner than otherwise, truck some of them, and start winter feeding with attendant feed costs earlier in the fall. None of the alternatives involves nominal expense and no evidence in the record supports such a theory. The questions presented are typically the type to be decided by a jury.

■ We conclude that ORS 374.085 reasonably contemplates a more direct crossing between the remaining parcels of the cattle ranch than anything provided or offered by the condemnor. Therefore, defendants were entitled to "compensation for the severance."

■ The court instructed that an element of damage is that which occurs "in consequence of * * * severance" which "can be considered by you to the extent that it affects the fair cash market value of the remaining land * * *." The court then read ORS 374.085 to the jury and said:

"* * * The defendants * * * are entitled to compensation in such amount as you shall determine for severance of their lands solely by reason of the failure * * * to provide crossings, plus any other

severance damage, if any, * * * as I have defined severance damage to you."

The state objected to the part of the instruction quoting the statute and what followed it. Taken as a whole, the instructions were clear that failure to provide a crossing was, alone, an element of severance damage to be considered with any other severance damages that were proven and then lumped together in finding loss of fair cash market value. *Cf., State Highway Com. v. Burk,* supra, 200 Or at 237.

Affirmed.

SCHWAB, C. J., specially concurring.

I reach the same result as does the majority, but via a rather different route.

The only significant question is whether the trial court erred in instructing the jury that, as a matter of law:

"* * * In this case, the plaintiff State Highway Commission has not provided a connecting road * * * for crossing said highway from one severed tract to the other * * *."

This is important under ORS 374.085 which requires provision "be made by the Department of Transportation for crossing the highway from one such [severed] tract to the other or compensation for the severance of the tract shall be paid." Resolution of this question requires interpretation of ORS 374.085 and analysis of the evidence to determine whether there was a jury question.

The statute. It is extremely difficult to perceive the legislative intent behind ORS 374.085, providing for severance damages for *farmland* in *certain situations,* when ORS 374.055(3) appears to provide for severance damages for *all land* in *all situations. See, State Highway Com. v. Bailey et al,* 212 Or 261, 284-

85, 319 P2d 906 (1957). And ORS 374.085 would present serious constitutional problems if applied to mean a single connection between tracts severed by a new highway would foreclose granting any severance damages. *State Highway Com. v. Burk et al.*, 200 Or 211, 236-37, 265 P2d 783 (1954).

But whatever the purpose or theory behind ORS 374.085, the present interpretation problem is: what kind of connection between severed tracts is contemplated. Defendants argue the connection must be a *direct* one. The state argues, and the majority apparently holds, the connection need only be a *reasonable* one. I agree with defendants.

The evidence. The state did provide a metal tube under the highway directly linking the two portions of defendants' property. In spite of evidence about its shortcomings, summarized by the majority, it seems to me that the existence of this tube was sufficient to carry the question of compliance with ORS 374.085 to the jury. But for some unknown reason the plaintiff did not so contend in the trial court or in this court.

Instead, the entire argument here involves an alleged "connection" between the severed tracts by way of frontage roads and a freeway interchange. Under my interpretation of ORS 374.085, that a direct link is required, the trial court correctly ruled that the frontage-roads-and-interchange route was insufficient.

Under the majority's interpretation, the evidence presents a much closer question. From the point where defendants' cattle would leave one parcel to the point where they would enter the other parcel is about two miles. It would only be necessary to make this trip twice a year. If only a reasonable connection is required, I tend to think this evidence presented a jury

question on the reasonableness of the connection furnished. It should have been for the jury to resolve questions like the believability of defendants' evidence that cattle pastured next to an interstate highway would be frightened by the sight of fast-moving traffic.